Robert M. Goodman
*rgoodman@greenbaumlaw.com*
Thomas K. Murphy III
*tmurphy@greenbaumlaw.com*
GREENBAUM, ROWE, SMITH & DAVIS LLP
75 Livingston Avenue, Suite 301
Roseland, NJ 07068-3701
P: 973/535-1600  F: 973/535-1698

Of Counsel:
Thomas H.L. Selby (admitted *pro hac vice*)
*tselby@wc.com*
David M. Krinsky (admitted *pro hac vice*)
*dkrinsky@wc.com*
Adam D. Harber (admitted *pro hac vice*)
*aharber@wc.com*
Christopher J. Mandernach (admitted *pro hac vice*)
*cmandernach@wc.com*
Ava V. Baker (admitted *pro hac vice*)
*abaker@wc.com*
WILLIAMS & CONNOLLY LLP
725 Twelfth St. NW
Washington, DC 20005
P: 202/434-5000  F: 202/434-5029

*Attorneys for Defendant Dropbox, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SYNCHRONOSS TECHNOLOGIES, INC.<br><br>Plaintiff,<br><br>v.<br><br>DROPBOX, INC.<br><br>Defendant. | Civil Action No: 3:15-cv-2192 (MLC) (TJB)<br><br>**MEMORANDUM OF LAW<br>IN SUPPORT OF<br>DEFENDANT'S MOTION TO DISMISS**<br><br>**ORAL ARGUMENT REQUESTED** |

# <u>TABLE OF CONTENTS</u>

I.    BACKGROUND ....................................................................................................2

II.   ARGUMENT ........................................................................................................3

    A.   LEGAL STANDARD....................................................................................4

    B.   THE CLAIMS OF THE '757 PATENT ARE NOT PATENT-ELIGIBLE
       UNDER 35 U.S.C. § 101....................................................................................6

        1.   Claim 1 of the '757 Patent is Directed to an Unpatentable Abstract
            Idea........................................................................................................6

        2.   Claim 1 of the '757 Patent Contains No Inventive Concept......................10

        3.   Claim 1 is Representative of the '757 Patent's Remaining Claims. ..........14

    C.   THE CLAIMS OF THE '446 PATENT ARE NOT PATENT ELIGIBLE
       UNDER 35 U.S.C. § 101...................................................................................16

        1.   Claim 1 of the '446 Patent is Directed to an Unpatentable Abstract
            Idea......................................................................................................16

        2.   Claim 1 of the '446 Patent Contains No Inventive Concept......................19

        3.   Claim 1 is Representative of the '446 Patent's Remaining Claims. ..........21

    D.   THE CLAIMS OF THE '696 PATENT ARE NOT PATENT ELIGIBLE
       UNDER 35 U.S.C. § 101...................................................................................22

        1.   Claim 1 of the '696 Patent is Directed to an Unpatentable Abstract
            Idea......................................................................................................23

        2.   Claim 1 of the '696 Patent Contains No Inventive Concept......................26

        3.   Claim 1 is Representative of the '696 Patent's Remaining Claims. ..........29

III.  CONCLUSION....................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) ............................................................................................... passim

*Alice Corp. v. CLS Bank International*, --- U.S. ---, 134 S. Ct. 2347 (2014) ....................... passim

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 1:10-cv-910, 2014 WL 5430956 (E.D. Va. Oct. 24, 2014) ....................................................................................25

*Bancorp Servs. v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266 (Fed. Cir. 2012).......................8

*Bascom Research, LLC v. LinkedIn, Inc.*, --- F. Supp. 3d ---, No. 12-cv-06293, 2015 WL 149480 (N.D. Cal. Jan. 5, 2015) .............................................................10

*Bilski v. Kappos*, 561 U.S. 593 (2010).........................................................................1, 5

*buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014)..............................................19, 20

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014) ........................................................................... passim

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) ...............................8

*Genetic Techs. Ltd. v. Lab. Corp. of Am. Holdings*, No. 12-1736-LPS, 2014 WL 4379587 (D. Del. Sept. 3, 2014) ..........................................................................6

*Gottschalk v. Benson*, 409 U.S. 63 (1972)..................................................................5

*Hewlett Packard Co. v. ServiceNow, Inc.*, No. 14-CV-00570-BLF, 2015 WL 1133244 (N.D. Cal. Mar. 10, 2015).......................................................................11, 20

*I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982 (Fed. Cir. 2014) (per curiam)...........................6

*In re Roslin (Edinburgh)*, 750 F.3d 1333 (Fed. Cir. 2014) .................................................5

*In re TLI Comm's LLC Patent Litig.*, --- F. Supp. 3d ---, 2015 WL 627858 (E.D. Va. Feb. 6, 2015)............................................................................... passim

*Intellectual Ventures I, LLC v. Symantec Corp.*, --- F. Supp. 3d ---, No. 10-1067-LPS, 2015 WL 1843528 (D. Del. April 22, 2015).................................................10, 19, 20, 28

*Intellectual Ventures II, LLC v. JP Morgan Chase & Co.*, No. 13-CV-3777, 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015)....................................................................20, 25, 28

*Mayer v. Belichick*, 605 F.3d 223 (3d Cir. 2010) ........................................................3

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. ---, 132 S. Ct. 1289 (2012) ...................................................................................................1, 4, 27

*Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, No. 13-984-GMS, 2015 WL 436160 (D. Del. Jan. 27, 2015).................................................................6, 16, 30

*OpenTV, Inc. v. Apple, Inc.*, No. 14-cv-01622-HSG, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015) ......................................................................................6, 13, 25

*Priceplay.com, Inc. v. AOL Advertising, Inc.*, --- F. Supp. 3d ---, 14-cv-92-RGA, 2015 WL 1246781 (D. Del. Mar. 18, 2015) ...................................................26, 27

*Shortridge v. Foundation Construction Payroll Service, LLC*, No. 14-cv-04850-JCS, 2015 WL 1739256 (N.D. Cal. April 14, 2015) .........................................13, 26

*Synchronoss Tech. Inc. v. NewBay Software, Inc.*, No. 11-cv-04947-FLW-TJB, Dkt. No. 65, at 9 (D.N.J. Nov. 28, 2012) ................................................................12

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014).......................................... passim

*Wireless Media Innovations, LLC v. Maher Terminals, LLC*, No. 14-cv-7004-JLL, 2015 WL 1810378 (D.N.J. April 20, 2015) .....................................................3, 6

## OTHER AUTHORITIES

*Fidelity National Information Services, Inc. v. DataTreasury Corp.*, No. CBM2014-00020, 2015 WL 1967327 (Patent Trial & Appeal Bd. Apr. 29, 2015) .........................................................................................................................9

35 U.S.C. § 101 ........................................................................................................... passim

Fed. R. Civ. P. 12(b)(6)..............................................................................................3, 5

This patent infringement case concerns one of the most basic concepts in information processing:  synchronization.  Plaintiff Synchronoss Technologies, Inc. asserts that Defendant Dropbox, Inc.'s industry-leading technology that allows its users—now totaling more than 300 million across more than 150 countries—to easily and seamlessly collect, store, and share their documents across multiple electronic devices, infringes U.S. Patent Nos. 6,671,757 (the "'757 patent"), 7,587,446 (the "'446 patent"), and 6,757,696 (the "'696 patent") (collectively, the "patents-in-suit").

Before Synchronoss can even attempt to enforce these patents, however, this Court must make a threshold determination:  Do the asserted patents claim patentable subject matter under 35 U.S.C. § 101?  *Bilski v. Kappos*, 561 U.S. 593 (2010); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. ---, 132 S. Ct. 1289 (2012); *Alice Corp. v. CLS Bank International*, ---U.S. ---, 134 S. Ct. 2347 (2014).  Specifically, under *Alice*, a district court must determine, as a pure question of law, whether the patents improperly attempt to claim an "abstract idea."  Since *Alice*, courts have dismissed scores of infringement cases, particularly in the Internet and computer contexts, because the asserted patents claim nothing more than abstract ideas imported into a technological context.

That is the situation here.  The patents-in-suit purport to claim and monopolize the abstract idea of synchronization using "difference information"—in layman's terms, updating one set of information to reflect changes made in a second set of the same information.  That same kind of synchronization happens anytime someone updates a desk calendar to reflect an appointment previously recorded in a pocket calendar, or updates a hard-copy legal treatise by inserting a "pocket part" to reflect new cases.  The patents-in-suit implement this abstract idea using computers, but the underlying idea existed long before the digital age.

Under *Alice*, "abstract ideas" like the use of difference information to perform synchronization are not patentable inventions unless the claims also contain an "inventive concept" that "transform[s]" the abstract idea into a patent-eligible invention.  134 S. Ct. at 2355.  Implementation of an abstract idea using known or generic hardware and software does not qualify as such an inventive concept.  Yet that is all the patents-in-suit do.  The asserted patent claims are each directed to a combination of components—like "management server[s]," "sync engine[s]," and "data interface[s]"—which, behind their labels, are just generic computer components, defined solely in terms of the function they perform.  In essence, the patents-in-suit purport to claim the idea of synchronization using the differences between data sets over networks and on computers. That is exactly what section 101 forbids.

As numerous courts since *Alice* have done when faced with similar claims, this Court should dismiss the Complaint for failure to state a claim.

## I.    BACKGROUND

The patents-in-suit all relate to the concept of synchronization using the changes or updates made to one copy of a file, which the patents call "difference information."[1]

The '757 patent, entitled Data Transfer and Synchronization System, contains twenty-nine claims, three of which are independent (claims 1, 16, 24).  The specification of the '757 patent concedes, as it must, that synchronization was well known before the priority date of the patent, but asserts that prior art synchronization schemes are "generally relatively inefficient" because they require transferring entire documents to be synchronized.  Col. 2, ll. 45-48; *see generally* Col. 1, l. 55-Col. 2, l. 8 (describing synchronization systems); Col 2, l. 31-Col. 3, l. 20 (same).  The purportedly novel solution to this perceived problem is to transfer only "difference

---

[1] The patents-in-suit are Exhibits A-C to Plaintiff's Complaint.  *See* Dkt. No. 1.

information"—that is, to transfer "only the changes" to data "and the instructions for implementing those changes." *E.g.*, Col. 3, ll. 25-55; Col. 6, ll. 8-11.

The '446 patent, entitled Acquisition and Synchronization of Digital Medial to a Personal Information Space, contains twenty claims, two of which are independent (claims 1 and 11). The claims in the '446 patent are directed to either a method or system for maintaining personal digital media data—like music and photo files—and synchronizing those files using difference information across a user's multiple Internet-connected devices. *See* '446 Patent, Col. 3, ll. 45-62.

The '696 patent, entitled Management Server for Synchronization System, contains twenty-five claims, four of which are independent (claims 1, 9, 16, 24). Like the '757 and '446 patents, the '696 patent claims systems or components for the management of data synchronization between devices. As the '696 patent describes, the purported invention "includes a system . . . for transferring data between two devices which require information to be shared between them." '696 Patent, Col. 4, ll. 25-28. As part of such systems, the '696 patent also claims an "authentication module" for "associating the user data with a particular user" and controlling access to that data. *Id.* at Col. 3, ll. 46-50.

As explained below, the patents-in-suit do not describe or claim *how* synchronization using difference information is done, other than at levels so broad—and using computer components so generic—that they essentially claim and attempt to monopolize the idea itself.

## II.    ARGUMENT

The patents-in-suit are invalid under 35 U.S.C. § 101. All three patents claim the abstract idea of synchronization of two files using just the changes or updates, and none of the claims supply an inventive concept sufficient to transform the abstract ideas into a patentable invention. The Complaint should therefore be dismissed under Federal Rule of Civil Procedure 12(b)(6). *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010); *Wireless Media Innovations, LLC v.*

*Maher Terminals, LLC*, No. 14-cv-7004-JLL, 2015 WL 1810378 (D.N.J. April 20, 2015).

    **A.**    **Legal Standard.**

    Title 35, section 101 of the United States Code addresses the threshold issue of whether a purported invention is the type of subject matter that can be patented.  An invention is patent-eligible if it claims a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101.  The broad categories that section 101 sets forth, however, have limits; the Supreme Court has "long interpreted" section 101 to forbid the issuance of patents directed to "laws of nature, natural phenomena, and abstract ideas," because such concepts are "the basic building blocks of human ingenuity."  *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1346 (Fed. Cir. 2014); *Alice*, 134 S. Ct. at 2354.  And for good reason:  Allowing monopolization of these matters would "impede innovation," thereby "thwarting the primary object of the patent laws."  *Alice*, 134 S. Ct. at 2354 (quotations omitted).

    The Supreme Court has set forth a two-step framework for determining whether a claim falls within the "abstract idea" exception to patent eligibility.  *Mayo*, 132 S. Ct. at 1293-94; *Alice*, 134 S. Ct. at 2355.  First, the Court must determine whether a claim as a whole is directed to a patent-ineligible concept, such as an abstract idea.  In so doing, it "must be careful to avoid allowing the typically convoluted claim language—'patent-ese'—to obfuscate the general purpose and real essence of software patent claims."  *In re TLI Comm's LLC Patent Litig.*, --- F. Supp. 3d ---, 2015 WL 627858, *6 (E.D. Va. Feb. 6, 2015).

    Second, if a patent is directed to an abstract idea, the Court must then consider the elements of the claim to assess whether they "transform the nature of the claim into a patent-eligible application of the abstract idea."  *Content Extraction*, 776 F.3d at 1347.  The law is clear that the mere "implement[ation of] an abstract idea on a computer" does *not* impart patent eligibility. *Alice,* 134 S. Ct. at 2358 (alterations and internal quotation omitted).  Nor does the inclusion of

claim components described in "purely functional and generic" terms. *Alice*, 134 S. Ct. at 2360 (finding no inventive concept in claims to a "data processing system" which included a "communications controller" and a "data storage unit"). Such broad and expansive claims place no meaningful limitation on the abstract idea, and effectively preempt and monopolize the field— precisely the concern the Supreme Court has articulated for decades. *See, e.g.*, *id.* at 2357; *Gottschalk v. Benson*, 409 U.S. 63, 72 (1972) (reversing grant of patent on mathematical process because "the patent would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself").

In conducting its analysis under *Alice*, the Court need not analyze every claim of every asserted patent. Instead, so long as "all the claims are substantially similar and linked to the same abstract idea," the Court may identify and analyze representative claims. *Content Extraction*, 776 F.3d at 1348; *id.* at 1345 (affirming invalidation of four patents with a total of 242 claims based on analysis of representative claims) (internal quotation omitted); *see also, e.g.*, *Alice*, 134 S. Ct. at 2359 (analyzing "representative" method claims); *In re TLI*, 2015 WL 627858, at *9 ("[W]here, as here, all of the claims are directed to the same abstract idea, the Federal Circuit teaches that addressing each claim of the asserted patents is unnecessary." (internal quotation omitted)).

Patent validity under section 101, moreover, is a pure question of law. *Bilski*, 561 U.S. at 602; *In re Roslin (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014). Courts routinely address this threshold question at the motion to dismiss stage, and regularly grant Rule 12(b)(6) motions to dismiss based on invalidity under section 101. *See, e.g.*, *Content Extraction*, 776 F.3d at 1349 (affirming dismissal under Rule 12(b)(6)); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed.

Cir. 2014) (same).[2]  Addressing an asserted patent's validity under section 101 at the outset of a

case can "spare both litigants and courts years of needless litigation."  *I/P Engine, Inc. v. AOL*

*Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014) (per curiam) (Mayer, J., concurring) (noting the

"clear advantages to addressing section 101's requirements at the outset of litigation"); *Genetic*

*Techs. Ltd. v. Lab. Corp. of Am. Holdings*, No. 12-1736-LPS, 2014 WL 4379587, at *6 (D. Del.

Sept. 3, 2014).

### B.  The Claims of the '757 Patent are Not Patent-Eligible under 35 U.S.C. § 101.

Though cloaked in technical and patent jargon, the claims of the '757 patent are directed

to the abstract idea of synchronizing multiple copies of a file over a network using information

about the changes or updates to one version of the file, and are implemented using generic hard-

ware and software components that are defined by the function they perform.  They are therefore

invalid under section 101.

### 1.  Claim 1 of the '757 Patent is Directed to an Unpatentable Abstract Idea.

As the Supreme Court held in *Alice*, the first step of determining whether a patent claim

is eligible for protection under section 101 is to determine whether the claim is "directed to a pa-

tent-ineligible concept," *i.e.*, an "abstract idea."  134 S. Ct. at 2355.  There is no question that the

claims of the '757 patent are directed to such an idea.

Claim 1, which is representative of the other claims in the patent, reads:

> 1.  A system for synchronizing data between a first system and a
> second system, comprising:
>
> a first sync engine on the first system interfacing with data on the

---

[2] *See also OpenTV, Inc. v. Apple, Inc.*, No. 14-cv-01622-HSG, 2015 WL 1535328, at *2 (N.D. Cal. Apr. 6, 2015) (dismissing under Rule 12(b)(6)); *Wireless Media Innovations*, No. 14-cv-7004-JLL, 2015 WL 1810378, at *20 (same); *Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, No. 13-984-GMS, 2015 WL 436160, at *6 (D. Del. Jan. 27, 2015) (same).

first system to provide difference information in a difference transaction;

a data store coupled to the network and in communication with the first and second systems; and

a second sync engine on the second system coupled to receive the difference information in the difference transaction from the data store via the network, and interfacing with data on the second system to update said data on the second system with said difference information;

wherein each said sync engine comprises a data interface, a copy of a previous state of said data, and a difference transaction generator.

'757 Patent, Claim 1.

Stripped of jargon, the idea underlying claim 1 is plainly abstract: changes to information in one location (the "first system") are communicated to another location (the "second system") and used to update the data in the second location to match the first. This idea has existed for as long as people have been keeping track of dynamic information, and applies, for example, to collections of information as diverse as calendars, accounting entries, and case law reporters. Here, the abstract idea is implemented on a computer: data on one electronic device such as a laptop computer (the "first system") is synchronized with that found on a separate device (the "second system") by way of a networked server or data storage location (the "data store") which is in communication with both devices. A so-called "sync engine" on the first device determines whether a document has been changed by comparing it to "a previous state of said data" (*i.e.*, a previous copy of the document) and then communicates the changes ("difference information") to the intermediate "data store," which sends them to the second device. The concept is illustrated simply in Figure 3 of the patent below, which shows System A determining changes and then sending them through the data store to System B, which receives them:



Figure 3

The '757 patent does not claim—or even purport to disclose—*how* the sync engine determines and communicates differences. It simply claims the idea of doing so, at a level so general that it can be applied without any computer at all. Consider, for example, a system for an executive (Jane) to "synchronize" her calendar with a copy maintained by her assistant (John):[3]

| ELEMENTS OF CLAIM 1 | CORRESPONDING STEP USING A TRADITIONAL OFFICE CALENDAR |
|---|---|
| a first sync engine on the first system interfacing with data on the first system to provide difference information in a difference transaction; | Jane reviews her office calendar to identify new calendar entries. |
| a data store coupled to the network and in communication with the first and second systems; and | Jane lists the new calendar entries on a piece of paper. |
| a second sync engine on the second system coupled to receive the difference information in the difference transaction from the data store via the network, and interfacing with data on the second system to update said data on the second system with said difference information; | John takes the piece of paper listing the new calendar entries and updates his copy of Jane's calendar, "synchronizing" his copy of Jane's calendar with Jane's own copy. |
| wherein each said sync engine comprises a data interface, a copy of a previous state of said data, and a difference transaction generator. | Both Jane and John are able to interface with their respective versions of Jane's calendar and determine what entries have changed—thereby serving as the "difference transaction generator." |

Where, as here, a claim "can be performed in the human mind, or by a human using a pen and paper," the claim is directed to "unpatentable mental processes." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011); *see Bancorp Servs. v. Sun Life Assur.*

---

[3] The '757 patent uses calendar data as one example of the type of information amenable to synchronization. *See, e.g.*, '757 Patent, Col. 1, ll. 38-44; *id.* at Col. 2, ll. 30-32 ("[T]he data to be synchronized is generally in the form of text data such as . . . calendar information.").

*Co. of Canada*, 687 F.3d 1266, 1277 (Fed. Cir. 2012) ("[A] machine, system, medium, or the like may in some cases be equivalent to an abstract mental process for purposes of patent ineligibility. . . . [T]he form of the claims should not trump basic issues of patentability.").

In that regard, courts have routinely concluded that concepts similar to those in claim 1 of the '757 patent are abstract ideas, even when the claims are limited to the computer-network field and couched in technical or patent jargon.  In *Content Extraction*, for example, the Federal Circuit affirmed the dismissal of a complaint based on a finding that the asserted patents were invalid under section 101.  Notwithstanding that the claims recited a method for "receiving output representing a diversity of types of hard copy documents from an automated digitizing unit," storing that information in "a memory," recognizing portions of the documents "corresponding to a first data field," and then storing that information "corresponding to said first data field into memory locations for first said data field," the court found that the asserted claims amounted to little more than "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory."  776 F.3d at 1345, 1347.  Such a method, the court reasoned, was merely the description of an abstract idea—"data collection, recognition, and storage"—which "is undisputedly well-known" and has always been performed by humans.  *Id.* at 1347.[4]  The same is true here.

Likewise, the Patent Trial and Appeal Board recently concluded in *Fidelity National Information Services, Inc. v. DataTreasury Corp.* that all sixty-seven claims of a patent directed to a "system for remote data acquisition, and centralized processing and storage of the acquired da-

---

[4]  It is of no moment that the claims of the '757 are directed to a "system" that, to the extent it includes at least some computer hardware, qualifies as a "machine," while the claims in cases like *Content Extraction* were to a method (a "process" under section 101).  In *Alice*, the Supreme Court dismissed as irrelevant what particular statutory category a claim is directed to, and warned "against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art."  134 S. Ct. at 2359 (internal quotations and brackets omitted).

ta" were invalid under section 101.  No. CBM2014-00020, 2015 WL 1967327, at *2, *12 (Patent Trial & Appeal Bd. Apr. 29, 2015).  While the claims included seemingly-complicated technical steps and concepts like "capturing images, managing the transaction data, collecting the data, encrypting subsystem identification information and transaction data, verifying data and transmitting data within and between a remote location and a central location," the Board found that underlying this jargon was an ineligible, abstract idea that was "generic in nature" and thus "risk[ed] . . . unacceptable preemption" of the broad concept.  *Id.* at *9.  Claim 1 of the '757 patent, which is similarly directed to the manipulation and transmission of data, is analogous.

As these cases illustrate, dressing up patent claims in technical language or employing generic computer components does not make them any less abstract.  *Alice* and its progeny confirm that in analyzing whether the claim is an abstract idea, the court must look beyond the jargon to the underlying idea to which the claim is directed.  *See, e.g.*, *Intellectual Ventures I, LLC v. Symantec Corp.*, --- F. Supp. 3d ---, No. 10-1067-LPS, 2015 WL 1843528, at *8 (D. Del. April 22, 2015) (invalidating claims "directed to receiving information related to a file . . . from a querying computer, characterizing the file based on the identifier and other stored identifiers, and communicating a result of the characterization back to a querying computer"); *Bascom Research, LLC v. LinkedIn, Inc.*, --- F. Supp. 3d ---, No. 12-cv-06293, 2015 WL 149480, at *8 (N.D. Cal. Jan. 5, 2015) (claims "allowing users to generate relationships between document objects and storing those relationships separately from the document objects simply describe[] the abstract idea of creating, storing data, and using relationships between objects").

Underneath "the typically convoluted claim language," claim 1 of the '757 patent is directed to an abstract idea.  *See In re TLI*, 2015 WL 627858, at *6.

## 2.    Claim 1 of the '757 Patent Contains No Inventive Concept.

The second step of the *Alice* inquiry requires the Court to "search for an inventive con-

cept" sufficient to "transform the nature of the claim into a patent-eligible" invention.  *Content Extraction*, 776 F.3d at 1347.  Claim 1 of the '757 patent contains no such inventive concept. Instead, it recites only generic and functional limitations that add nothing to the abstract idea.

In *Alice*, the Supreme Court made clear that hardware and software components— regardless of their labels—provide no inventive concept when they are "purely functional and generic" in nature.  134 S. Ct. at 2360 (finding no inventive concept in claims to a "data processing system" which included a "communications controller" and a "data storage unit").  Reciting generic computer components to implement an abstract idea that are defined by the function they perform "is no different than adding [the words] 'instructions for' in front of the abstract idea; in either case, any and all implementations of the abstract idea are being claimed, which is essentially equivalent to claiming the abstract idea itself."  *Hewlett Packard Co. v. ServiceNow, Inc.*, No. 14-CV-00570-BLF, 2015 WL 1133244, at *6 (N.D. Cal. Mar. 10, 2015) (declining to find an inventive concept in a claim reciting components of a "monitoring server," "database," and "help desk client," all of which were defined in terms of their function).

Like the "communications controller" and "data storage unit" in *Alice*, and the "monitoring server" and "help desk client" in *Hewlett Packard*, the hardware and software components in claim 1 of the '757 patent are generic in nature and defined entirely by the function they perform in carrying out the abstract idea.[5]  The hardware components of the claim—the "first system," "second system," "network," and "data store"—are thoroughly generic.  And the software components—the first and second "sync engine[s]" and "difference transaction generator"—are

---

[5] The analysis under section 101 focuses solely on the level of detail in the claims; whether the specification contains a level of detail sufficient to provide an inventive concept (here, it does not) is irrelevant to the analysis.  *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013)  ("[T]he complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method.").

completely defined by the function they perform in the claim.  In other words, as used in the claims, a "difference transaction generator" is just a piece of software that can determine edits to a document, and a "sync engine" is just a generic piece of software that receives or transmits those edits.[6]  The patent does not describe or claim any unique design of a "difference transaction generator" to determine changes to a document based on the prior version, or a "sync engine" to transmit or apply those changes.

As in *Alice*, numerous courts have rejected the notion that claims containing such purely functional and generic elements can supply the requisite inventive concept for patentability under section 101.  In *Content Extraction*, the Federal Circuit concluded that there was no inventive concept in the use of "a generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry."  776 F.3d at 1348.  Similarly, in *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, the Federal Circuit concluded that claims reciting "generalized software components arranged to implement an abstract concept on a computer" were unpatentable under section 101.  728 F.3d 1336, 1344–45 (Fed. Cir. 2013).  Like the components of the '757 patent claims, the components in *Accenture* were all generic and functionally-defined, including a "'data component that stores, retrieves and manipulates data' and a client component that 'transmits and receives data to/from the data component,'" a "business component that 'serves as a data cache and includes logic for manipulating the data,'" and a "controller component to handle program events and an adapter component to interface with a data repository."  *Id.* at 1338.

---

[6] Plaintiff has admitted as much, having asserted in a prior litigation involving the '757 patent that the term "sync engine" should be construed to mean "a software application that can analyze a data set and modifications to that data set, transmit/generate a representation of modifications to a data set, receive a representation of modifications to a data set, and modify a data set."  *See Synchronoss Tech. Inc. v. NewBay Software, Inc.*, No. 11-cv-04947-FLW-TJB, Dkt. No. 65, at 9 (D.N.J. Nov. 28, 2012).

Likewise, in *Shortridge v. Foundation Construction Payroll Service, LLC*, the court emphasized that merely employing colorful descriptions for otherwise generic and functionally-defined computing components failed to transform an abstract idea into patent-eligible subject matter.  No. 14-cv-04850-JCS, 2015 WL 1739256 (N.D. Cal. April 14, 2015).  There, as in *Accenture*, the elements of the claimed system included a "computer processor, or a networked plurality of computer processors," "at least one data base application," "at least one user interface," and "an augmentation and supporting engine" for various purposes.  *Id.* at *3; *see also OpenTV*, 2015 WL 1535328, at *6 (finding system claim components were "described solely in terms of their functions, and the 'broadcasting,' 'receiving,' 'storing,' 'assembling,' 'associating,' and 'transmitting' functions performed by those components boil down to electronic communication and recordkeeping, two of the 'most basic functions of' generic computer technology").

The components discussed in these cases are not distinguishable in any meaningful way from the limitations of the '757 patent.  As these courts have recognized, to sanction such generic, overbroad limitations "risk[s] disproportionately tying up the use of the underlying idea[]" itself, which is exactly what section 101 is designed to prevent.  134 S. Ct. at 2354.  That Synchronoss has already sued *eight* unrelated companies for infringing the '757 patent in this District alone illustrates the very concern the Supreme Court intended to address in *Alice*.[7]

Because the limitations of claim 1 of the '757 fail to provide an inventive concept, the claim is invalid as unpatentable under section 101.

---

[7] *See Synchronoss Techs., Inc. v. Asurion Mobile Applications, Inc.*, 3:11-cv-05811; *Synchronoss Techs., Inc. v. Carbonite*, 3:15-cv-00964; *Synchronoss Techs., Inc. v. Egnyte*, 3:15-cv-00534; *Synchronoss Techs., Inc. v. F-Secure*, 3:14-cv-06220; *Synchronoss Techs., Inc. v. Funambol*, 3:14-cv-06017; *Synchronoss Techs., Inc. v. Newbay Software*, 3:11-cv-04947; *Synchronoss Techs., Inc. v. Vox Mobile*, 3:11-cv-06713; *Synchronoss Techs., Inc. v. Hyperlync Techs., Inc.*, 3:15-cv-02845.

### 3. Claim 1 is Representative of the '757 Patent's Remaining Claims.

The remaining claims of the '757 patent are "substantially similar and linked to the same abstract idea" as claim 1. *Content Extraction*, 776 F.3d at 1348. Because they, too, fail to add any inventive concept, they are likewise invalid under section 101. *Id.*; *In re TLI*, 2015 WL 627858, at *9 ("[W]here, as here, all of the claims are directed to the same abstract idea, the Federal Circuit teaches that addressing each claim of the asserted patents is unnecessary." (internal quotation omitted)).

In particular, the '757 patent contains two additional independent claims—both of which are directed to the same abstract idea of synchronization using difference information, and neither of which adds a sufficiently inventive concept for patent eligibility. Like claim 1, independent claim 16 is directed to a system that connects a "first device," which contains at least a "data file" and "differencing code," to a "data store," which is connected in turn to a "second device," with its own "differencing code," to receive the "change transactions." Just as in claim 1, a "sync engine" is included to perform the synchronization. Unlike claim 1, however, independent claim 16 contemplates that the difference information can move in both directions—that is, the first device can both send and receive "change transactions" from the second device, just as the second device can do the same from the first device. Figure 4 shows a basic embodiment:



Claim 16 adds nothing to claim 1 that makes it patent-eligible under section 101. It is directed to the same abstract idea, and its limitations are purely functional and generic in nature. The final independent claim, claim 24, generally replicates the system described in claim 16 us-

ing similar components, only it expressly requires that the data store be a "server" and that it, and the two devices, have a connection to the Internet.  A generic hardware component like a "server" is akin to a generic computer or scanner, and is not transformative for the same reasons.  *See supra* p. 13.  Nor does a mere connection to the Internet transform the claims into a patentable invention.  *See, e.g.*, *Ultramercial*, 772 F.3d at 716 ("The claims' invocation of the Internet also adds no inventive concept.").

The dependent claims likewise fail to add any inventive concept that transforms them into patentable inventions.  They broadly fall into the following categories:

- Claims 2, 3, and 17 specify the generic type of network used in the claimed system—such as a "private network" (claim 2) or an "Internet connection" (claim 3).

- Claims 4, 5, 6, 7, 15, and 18 specify by what pathway or when the difference information is transmitted.  *E.g.*, Claim 4 (specifying transmittal from the first sync engine to the second through the data store); Claim 15 (specifying a plurality of synch engines on a plurality of systems).

- Claims 19 and 27 reiterate aspects of the abstract idea that are present in claim 1—claim 19 requires using "change transactions" to update a data file, and claim 27 requires transferring "difference transactions."

- Claims 13, 14, 26, and 28 specify the format of communication between components at a broad and non-inventive level—for example, claim 26 specifies that such communications are "encoded and compressed," and claim 13 recites that the difference information is encoded in an unspecified "universal format."

- Claims 8, 9, 10, 11, 12, 20, 21, 22, 23, 25, and 29 recite additional functionally described components that may be added to the claimed system, such as a common

15

"sync server" (claim 12), a "management server" (claim 25), or a wholly generic "device" (claim 11).

Simply increasing the number of generic and functional limitations in a claim otherwise directed to an abstract idea, however, does not make it patentable under *Alice*. Holding that such non-inventive limitations were sufficient to transform the abstract idea into a patent-eligible invention "would provide a blueprint for patent drafters to skirt § 101, merely by tacking on routine, well-known limitations." *Money Suite*, 2015 WL 436160, at *4 ("dependent claims [that] ostensibly narrow the scope of the claims" are not patent-eligible where "the limitations cannot be considered inventive").

These claims, like claim 1, are invalid under section 101.

**C.     The Claims of the '446 Patent are Not Patent Eligible under 35 U.S.C. § 101.**

The '446 patent, like the '757 patent, claims synchronization using difference information—only here it is applied in the context of media files, like digital pictures or music files. Because the '446 patent claims this abstract idea using generic, functionally-defined components on a common computer network, its claims, too, are invalid under section 101.

**1.     Claim 1 of the '446 Patent is Directed to an Unpatentable Abstract Idea.**

The claims of the '446 patent are directed to both a method and system for transferring digital media data—like music or photo files—to an electronic device, such as a laptop or desktop computer. Claim 1, which is representative of the other claims in the patent, reads:

> 1. A method of transferring media data to a network coupled apparatus, comprising:
>
> (a) maintaining a personal information space identified with a user including media data comprising a directory of digital media files, the personal information space being coupled to a server and a network;

(b) generating a first version of the media data in the personal information space;

(c) generating a digital media file, in response to an input from the user, comprising a second version of the media data in a same format as the first version in the personal information space, the second version including an update not included in the first version;

(d) obtaining difference information comprising differences between the first version of the media data and the second version of the media data; and

(e) transferring a digital media file over the network containing the difference information from the personal information space to the network coupled apparatus in response to a sync request made from a web browser at the network-coupled apparatus by the user.

'446 Patent, Claim 1.

At a general level, the purported invention includes steps to synchronize media files housed on a network-connected digital storage space (a "personal information space identified with a user") with a laptop, PC, or other similar device (the "network coupled apparatus"). Two versions of the media data are created (a "first version" and a "second version"), where the "second version" contains updates to the first. The "difference information" reflecting these updates is collected, and, in response to a user-initiated "sync request" made from a web browser on the device to be synchronized, is transmitted to the device.

The abstract idea behind claim 1 of the '446 patent is the same as that described in the context of the '757 patent.[8] The principal difference is that this idea is applied to media files. The essence of the claim is to take changes made to one version of a user's media data and, in response to a user input, apply those changes to another version of the data maintained on another device. *See, e.g.*, '446 Patent, Col. 3, ll. 22-24. That activity, at its core, is synchronization

---

[8] The '446 patent incorporates by reference the '757 patent. *See* '446 Patent, Col. 1, ll. 10-11.

with so-called "difference information," and for the reasons already described above in the context of the '757 patent, it is an abstract idea. *See supra* pp. 6-10.

While claim 1 of the '446 patent appears to add some elements to the synchronization described in the '757 patent, those additional elements do not make the essence of claim 1 any less of an abstract idea. Claim 1, for example, is directed expressly to a particular type of files— "media data." *See, e.g.*, '446 Patent, Col. 1, ll. 43-45. But the type of file being synchronized— whether a music file or a calendar entry, as in the '757 patent—does not change whether synchronization itself is an abstract idea. *Cf. Accenture*, 728 F.3d at 1345 (holding that "attempts to limit the abstract concept . . . to a specific industry . . . do[es] not provide additional substantive limitations to avoid preempting the abstract idea").

Claim 1 also requires "a personal information space identified with the user," which is connected to "a server and a network." As the specification notes, a "personal information space" is a "data store of information customized by, and on behalf of the user which contains both public data the user puts into their personal space, private events in the space, and other data objects such as text files or data files which belong to the user." '446 Patent, Col. 2, ll. 23-27; *see id.* Col. 1, ll. 50-55. This limitation describes something already contemplated in synchronization—claim 1 of the '757 patent, for example, recites a "data store coupled to the network and in communication with the first and second systems." The fact that the data store recited in claim 1 of the '446 patent is "personal" does not elevate the claims above the level of an abstract idea. Like the "organizing, classifying, and storing" of information found to be an abstract idea in *TLI*, the organization of media information on a personal level is something that can be done, and has been done, without the use of computers. *See* 2015 WL 627858, at *10. And while claim 1 requires the personal information space be connected to a server and network, that is a

18

common feature and one that courts have repeatedly held does not make otherwise unpatentable subject matter patentable. *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Intellectual Ventures I*, 2015 WL 1843528, at *11 (to the same effect).  Thus, the "personal information space" element does not make the essence of claim 1 any less abstract.

Finally, claim 1 expressly contemplates that the synchronization is user initiated—*i.e.*, that the data transfer is made "in response to a sync request made from a web browser at the network-coupled apparatus by the user."  This, too, does not make the idea behind the synchronization of claim 1 any less abstract, as multiple courts have recognized. *See, e.g.*, *Ultramercial*, 772 F.3d at 715 (invalidating claim with element to take steps after "receiving a request . . . from the consumer"); *In re TLI*, 2015 WL 627858, at *12 ("manipulating data based on inputs from the user . . . is yet another 'conventional computer task,' and therefore an abstract idea") (internal quotation omitted).

### 2.      Claim 1 of the '446 Patent Contains No Inventive Concept.

Claim 1 also lacks the "inventive concept" needed to "transform the nature of the claim into a patent-eligible application." *Content Extraction*, 776 F.3d at 1347.

The claim merely recites "routine" and "conventional steps, specified at a high level of generality," devoid of any explanation or description of how the particular function is to be performed. *Ultramercial*, 772 F.3d at 716; *see also Alice*, 134 S. Ct. at 2357.  There is no limitation on how "generating a first version of the media data," "generating a digital media file," or "obtaining difference information" is to be accomplished.  Nor is there any limitation on what (if any) components are needed to perform these steps.  The descriptions are merely functional recitations of tasks to be accomplished by software modules, and provide no inventive concept. *See,*

*e.g.*, *Intellectual Ventures II, LLC v. JP Morgan Chase & Co.*, No. 13-CV-3777, 2015 WL 1941331, at *11 (S.D.N.Y. Apr. 28, 2015) (finding no inventive concept, in part, because claim fails to specify how software element performs its recited function); *Hewlett Packard*, 2015 WL 1133244, at *8 (finding no inventive concept, in part, because claim element "says nothing of how the data structure is capable of performing" its function).

Courts have repeatedly found that elements analogous to those included in claim 1 of the '446 patent fail to provide a transformative concept. In *buySAFE*, for example, the Federal Circuit rejected attempts to patent a method for guaranteeing a party's performance of its online transaction that included steps directed to [1] "receiving by at least one computer application program . . . a request from a first party" for a "performance guarantee for an 'online commercial transaction,'" [2] "processing, by at least one computer application program" the request, and [3] "offer[ing], via a computer network," the performance guarantee. 765 F.3d at 1352. Like the claims rejected in *buySAFE*, the method of claim 1 of the '446 patent involves receiving a request from the user to generate a digital media file; the application processes the request and generates difference information, then transfers that information to other devices via a network.

Likewise, in *Intellectual Ventures I*, the court rejected as unpatentable claims directed to a method for identifying spam and virus-containing emails. 2015 WL 1843528. The claimed method included elements directed to "receiving . . . file content identifiers for data files from a plurality of file content identifier generator agents, each agent provided on a source system and creating file content IDs using a mathematical algorithm," "determining, on the processing system, whether each received content identifier matches a characteristic of other identifiers," and "outputting . . . an indication of the characteristic of the data file based on said step of determining." *Id.* at *7. Because the patent "disclose[d] no specialized machine or programming"—other

than generic hardware and software—"that would play a significant part in permitting the claimed method to be performed," the claims contained no inventive concept. *Id.* at *11. The same is true of the '446 patent.

Underneath the patent and technical jargon, the elements of claim 1 of the '446 patent fail to provide the inventive concept required to transform its otherwise unpatentable abstract idea into a patentable subject matter.

### 3. Claim 1 is Representative of the '446 Patent's Remaining Claims.

Because all of the claims are "substantially similar and linked to the same abstract idea," claim 1 is representative of the other claims in the '446 patent, which are unpatentable under section 101 for the same reason. *Content Extraction*, 776 F.3d at 1348.

The only other independent claim in the patent, claim 11, is directed to a system that allows the media data transfers described in the method of claim 1. As in claim 1, the system comprises a "personal information store" to store a digital media files, and a component to obtain the "difference information" between multiple versions of the media files and then transfer that information to a network-coupled device in response to a user-initiated sync request. Just as in *Alice*, where "computer system" claims were unpatentable because they were "no different from the method claims in substance," 134 S. Ct. at 2360, independent claim 11 adds no inventive concept to the unpatentable method recited in claim 1. As the Federal Circuit has emphasized, when a "system claim and method claim contain only 'minor differences in terminology [but] require performance of the same basic process . . . they should rise or fall together." *Accenture*, 728 F.3d at 1344 (internal quotation omitted). Holding otherwise would privilege "draftsman's art" over the substance of the claims. *Alice*, 134 S. Ct. at 2359.

In addition, as with the '757 patent, the claims that depend from the two independent claims add little detail or depth to the concepts set forth in the independent claims.

- Claims 2, 3, 5, 8, 9, and 10 specify, at an entirely generic level, how data is transmitted or maintained in the claimed method. *E.g.*, Claim 2 (reciting "receiving information into the personal information space" before "maintaining a personal information space").

- Claims 4 and 6 specify the type of network-coupled apparatus—*i.e.*, an "automotive computer" (claim 4)—or the type of media data—*i.e.*, a "directory of media files."

- Claims 7, 12, 13, and 14 specify generic software or hardware components used in relation to the "personal information space" in the claimed method or system. *E.g.*, Claim 12 ("the personal information store is provided on a server"); Claim 13 ("the server is coupled to the Internet").

For the same reasons described above, *see supra* pp. 19-21, such claims add no inventive concept and are therefore invalid for the same reason as claim 1.

**D.      The Claims of the '696 Patent are Not Patent Eligible under 35 U.S.C. § 101.**

The claims of the '696 patent, the final patent-in-suit, are also invalid under section 101. At most, the '696 patent adds to the idea of synchronization two additional, equally abstract ideas—version control and "authentication," *i.e.*, identifying users.[9]  That addition does nothing to make the claim any less abstract.  And like the claims of the other patents, the claims of the '696 patent do nothing more than describe the implementation of these abstract ideas using generic, functionally-defined components on a ubiquitous computer network.  They therefore fail to transform the abstract idea into a patent-eligible invention.

---

[9] That the two patents share a common idea is unsurprising:  although not formally related, much of the specification for the '696 patent is identical to that of the '757 patent and all 17 figures included in both patents are exactly the same.

22

       **1.**     **Claim 1 of the '696 Patent is Directed to an Unpatentable Abstract Idea.**

Claim 1 of the '696 patent, which is representative of the other claims, relates to the synchronization of data within a networked system.  It reads:

> 1.  A controller for a synchronization system, comprising:
>
> a user identifier module;
>
> an authentication module identifying a user coupled to the synchronization system;
>
> a synchronization manager communicating with at least one interactive agent to control data migration between a first network coupled device and a second network device;
>
> a transaction identifier module assigning a universally unique identifier to each user of transaction objects in said data store;
>
> and a current table of universally unique identifier values and versioning information, generated by versioning modules on said devices associating a transaction identifier with each transaction object, providing a root structure for understanding the data package files.

'696 Patent, Claim 1.[10]

Whereas claim 1 of the '757 patent claims "[a] system for synchronizing data," claim 1 of the '696 patent recites "[a] controller for a synchronization system."  This so-called "controller" includes a component to determine the users present in the system (a "user identifier module") and one to "authenticat[e]" these users.  In other words, one component determines the presence of a user in the system, and the other determines who that user is.  The controller also includes a component to control the flow of data between the users (a "synchronization manager").  Finally,

---

[10] The claims of the '696 patent were markedly revised from their original form by way of multiple certificates of correction.  Defendant includes these changes in the claim language for purposes of this motion only, but reserves the right to challenge the propriety of any changes made through the correction process.

the controller includes a component (a "transaction identifier module") that assigns an individual number to each of the changes to be made between the document versions ("a universally unique identifier"), and a "current table" maintaining these individual version numbers.

Underneath this jargon is the same abstract idea at the heart of the '757 patent. The essence of the synchronization described in the '696 patent is the same as that claimed in the '757 patent: applying the changes made to one version of file to another version of the same file on a different device. *See, e.g.*, '696 Patent, Col. 3, ll. 20-23 ("The invention, roughly described, comprises a controller for a synchronization system . . . useful for maintaining matching records and data for a user across multiple network coupled devices."). For the reasons described above in the context of the '757 patent, such synchronization is an abstract idea. *See supra* pp. 6-10.

That claim 1 of the '696 patent also includes limitations related to authentication and version tracking does not make it any less abstract. Authentication, as used here, is merely determining who a user is, and associating data with a particular user. *See, e.g.*, '696 Patent, Col. 3, ll. 24-25 (describing function of "authentication module" for "identifying a user coupled to the synchronization system"); Col. 3, ll. 47-51 (describing "authentication module" for, *inter alia*, "associating the user data with a particular user" and "identifying the user agent as associated with a user having access to the user data"). The idea of identifying an individual and then associating information with that individual is neither concrete nor novel. Going back to the example described above in which "Jane" synchronizes changes to her a version of her calendar maintained by "John," such an "authentication" is performed if John maintains calendars for multiple executives, and confirms who he is speaking to before accepting the changes to a particular executive's calendar and applying them. *See supra* p. 8. It also happens any time a bank teller asks for a driver's license before accessing a customer's account. That authentication is routinely per-

formed by humans without the use of computers confirms that the claim is directed to an abstract idea. *See supra* p. 9.

Unsurprisingly, a number of courts have found that claims relating to authentication are abstract ideas under section 101. In *Intellectual Ventures II*, for example, the court invalidated three patents under section 101, one of which was directed to an allegedly new way of "filtering packetized information received by a network's firewall," and another of which was directed to a system and method for controlling access to "digital property." 2015 WL 1941331, at *1-2. In the first patent, the court noted that access through the firewall was based upon "who sent the packet and who is to receive it . . . as well as the message being sent," *id.* at *8—in other words, regulating access based upon identity. In the second patent, the court found that "the process of controlling access to decrypted portions of distributed data"—*i.e.*, authentication—was "nothing more than an abstraction." *Id.* at *12. The *Intellectual Ventures II* decision is not an isolated one. *See, e.g.*, *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 1:10-cv-910, 2014 WL 5430956, at *5-6 (E.D. Va. Oct. 24, 2014) (finding claim including steps directed to "correlating [a] first network accounting record with accounting information available from a second source" was directed to an abstract idea); *OpenTV*, 2015 WL 1535328, at *2, *4 (finding claims with elements "related to the transmission and verification of information, including 'user identifiers' and 'other user information'" were directed to an abstract idea).

The concept of version tracking in claim 1 of the '696 patent likewise fails to elevate the claim above that of an abstract idea. Such version tracking is little more than maintaining a record of the changes made. The real-world, pen-and-paper examples of version tracking are numerous—including a record of changes in a treatise or other publication to record basic information about versions and changes. As the Federal Circuit has found, because humans easily

and routinely engage in this practice without a computer at all, it is considered an abstract idea. *See supra* p. 9.  In *Ultramercial*, for example, the patent at issue included an element directed to "recording the transaction event to the activity log, . . . including updating the total number of times the sponsor message has been presented."  772 F.3d 709, 712 (Fed. Cir. 2014).  The Federal Circuit nonetheless found that the claim embodied only an abstract idea.  *Id.* at 715.

Combining the abstract ideas of authentication and version tracking with synchronization does not make the claim any less abstract.  *See Shortridge*, 2015 WL 1739256, at *11 ("The Court is aware of no case holding that merely combining two or three abstract ideas brings a patent within the scope of § 101, and the available authority tends to suggest the contrary."); *Priceplay.com, Inc. v. AOL Advertising, Inc.*, --- F. Supp. 3d ---, 14-cv-92-RGA, 2015 WL 1246781 (D. Del. Mar. 18, 2015), at *4 (invalidating claims because the "claimed invention merely combines the abstract ideas found to be patent-ineligible").  That is certainly the case here, where authentication and version tracking fit together so naturally.  Incorporating either concept in the calendar synchronization example described above, for example, would not change the abstract idea of the synchronization.  Identifying or "authenticating" Jane as the person whose calendar is being edited before receiving or applying any of her changes, or requiring John to track the particular versions of the changes made to his copy of Jane's calendar does not change the abstract nature of the synchronization taking place.

Claim 1 of the '696 patent is therefore directed to an abstract idea.

## 2.    Claim 1 of the '696 Patent Contains No Inventive Concept.

Like the claims of the '757 patent, claim 1 of the '696 patent lacks an inventive concept sufficient to transform it into a patent-eligible invention.  As an initial matter, the combination of synchronization and authentication in one claim is not an inventive concept; "merely combin[ing] . . . abstract ideas found to be patent-ineligible" does not give rise to a transforma-

tive inventive concept under *Alice* step two. *Priceplay.com*, 2015 WL 1246781, at \*4; *see also Mayo*, 132 S. Ct. at 1298. And beyond the abstract idea, the claims of the '696 patent include only generic hardware and software components that are defined purely in terms of the function they perform. As explained with respect to the '757 patent, this is insufficient to confer patent-eligibility under section 101. *See supra* pp. 10-13.

Each of the components of claim 1 is described purely in terms of its high-level function. Claim 1 includes two modules for authentication: the "user identifier module" and the "authentication module." The "authentication module" is described only in that it "identif[ies]" users of the system; the "user identification module" has no description at all. Claim 1 also includes a module for synchronization—the "synchronization manager"—which, according to the claim, "control[s] data migration" between devices. Finally, claim 1 includes two modules for version tracking: a "transaction identifier module" and a "versioning module[]." The only description of the "transaction identifier module" is that it "assign[s] a universally unique identifier" to each user. For the "versioning module," the description is similarly vague and functional, stating only that it generically associates a "transaction identifier" with a "transaction object" to generate a table showing the version changes. The '696 patent nowhere purports to have invented a novel way of performing any of these function—whether authenticating users or tracking versions of a file.

In essence, the claim is simply a combination of generic "components" or "modules" for executing the abstract ideas the claim embodies. Even if this combination appears complex, "the complexity of the implementing software . . . does not transform a claim reciting only an abstract concept into a patent-eligible system or method." *Accenture*, 728 F.3d at 1345.

In fact, the generic and functional limitations in claim 1 parallel numerous limitations that

courts have found not to impart any inventive concept.  As to the elements directed to authentication, the court in *Intellectual Ventures I*, for example, invalidated a claim which included a so-called "uniqueness limitation," which described "receiving, on a second computer, a digital content identifier created using a mathematical algorithm unique to the message content from at least two of a plurality of first computers having digital content ID generator agents."  2015 WL 1843528, at *7.  The patent owner claimed that this unique identification process involved "hashing," and was part of an "innovative combination of limitations."  *Id.* at *10.  The court rejected that contention, finding that "hashing is just one of many mathematical algorithms that could be used to implement the uniqueness limitation," and that "mathematical algorithms" are "abstract ideas."  *Id.*  Similarly, in *Intellectual Ventures II*, the court considered a limitation requiring the use of a general "access mechanism" to enforce pre-selected access rules did not provide an inventive concept.  It was "nothing more than programming conventional software or hardware to apply rules governing access—a routine, conventional practice."  *Intellectual Ventures II*, 2015 WL 1941331, at *14.  The generic authentication modules of claim 1 of the '696 patent are no different—they are merely software modules comprised of mathematical algorithms to identify users.  Without any description or limitation on the algorithms at issue, they are "nothing more than programming conventional software . . . to apply rules governing access."  *Id.*

The same is true for the version tracking limitations in claim 1.  The court in *Ultramercial* held that "updating an activity log" was merely a "routine, conventional activity" that failed to provide any innovative concept.  772 F.3d at 715-16.  And in *Accenture*, the Federal Circuit affirmed the invalidation of claims that included various software components which performed functions akin to the version tracking modules here, including a "data component that . . . retrieves and manipulates data," a "client component that transmits and receives data to/from

the data component," a "business component that serves as a data cache and includes logic for manipulating the data," and a "controller component to handle program events and an adapter component to interface with a data repository."  728 F.3d at 1338 (internal quotation omitted). Together, these cases make clear that elements reciting the broad strokes of version tracking and management are not inventive without description or detail on how the generic modules operate. The elements of claim 1 of the '696 patent are no different.

Thus, claim 1 of the '696 patent fails to provide an inventive concept required to transform the otherwise unpatentable abstract idea into a patentable invention.

### 3.   Claim 1 is Representative of the '696 Patent's Remaining Claims.

The remaining claims of the '696 patent are invalid under section 101 for the same reason as claim 1.  Those claims are "substantially similar [to claim 1] and linked to the same abstract idea."  *Content Extraction*, 776 F.3d at 1348.  Like claim 1, the other independent claims are directed to systems or components in systems for synchronizing data.  Independent claim 9 claims a "data synchronization system" for "synchronizing data between network coupled devices," reciting many of the same elements in claim 1, including a "user identifier module," a "transaction identifier module," and a "current table" maintaining the version and change information.  The only additional limitations are a generic "storage server" and "management server," which fail to elevate the claim above the generic and functional components that were invalid for claim 1.  *See supra* pp. 27-28.  Similarly, independent claims 16 and 24 are directed to a "synchronization agent management server" and a "synchronization controller," respectively, and both rely on many of the same generic and functional components identified in claims 1 and 9.  Claim 16 adds a generic "user login authenticator" and "user data flow controller," but fails to give any content to these limitations other than the function they perform.  The same is true for claim 24, which adds only a generic "communication interface coupled to the network."  As with claim 1,

these limitations are insufficient to elevate the abstract ideas embodied in these claims into a pa-
tentable invention. *See supra* pp. 27-28.

Nor do the dependent claims of the '696 patent add sufficient detail or depth to the con-
cepts set forth in the independent claims to render them patentable.

- Claims 2, 3, 10, 11, 12, 17, 18, 19, 23, and 25 specify additional generic and non-
  novel features of the claimed system—for example, by indicating the authentication
  module determines a user's identity through a wholly generic "login procedure"
  (claim 3), or that such "login is a username and password" (claim 18).

- Claims 4, 5, and 16 specify the particular configuration of the generic, non-novel
  components. *E.g.*, Claim 16 (specifying a plurality of synchronization agents).

- Claims 6, 7, 8, 13, 14, 15, 20, 21, and 22 generically specify how data flows between
  components—for example, a data flow that "comprises downloading transactions
  from the data store" to the "network-coupled device" (claim 13), or a flow that "com-
  prises uploading transactions" from the "network-coupled device" to the "data store"
  (claim 14).

The "tacking on [of such] routine, well-known limitations" do not provide the inventive
concept needed to transform the abstract idea into a patentable invention. *Money Suite*, 2015
WL 436160, at *4. These claims, like claim 1, are therefore invalid under 35 U.S.C. § 101.

## III.    CONCLUSION

For the foregoing reasons, Dropbox respectfully requests that the Court grants its motion
to dismiss.

Respectfully submitted,

Dated:  May 29, 2015                    /s/ Robert M. Goodman
                                        Robert M. Goodman

rgoodman@greenbaumlaw.com
Thomas K. Murphy III
tmurphy@greenbaumlaw.com
GREENBAUM, ROWE, SMITH & DAVIS LLP
75 Livingston Avenue, Suite 301
Roseland, NJ 07068-3701
P: 973/535-1600  F: 973/535-1698

Of Counsel:

Thomas H.L. Selby  (admitted *pro hac vice*)
tselby@wc.com
David M. Krinsky  (admitted *pro hac vice*)
dkrinsky@wc.com
Adam D. Harber  (admitted *pro hac vice*)
aharber@wc.com
Christopher J. Mandernach  (admitted *pro hac vice*)
cmandernach@wc.com
Ava V. Baker  (admitted *pro hac vice*)
abaker@wc.com
WILLIAMS & CONNOLLY LLP
725 Twelfth St. NW
Washington, DC 20005
P: 202/434-5000  F: 202/434-5029

*Attorneys for Defendant Dropbox, Inc.*

31